MICHELLE WAMSER,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

Defendant.

No. 12 C 6197

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Michelle Wamser filed this action seeking review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (SSA). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB, a claimant must establish that he or she is disabled within the meaning of the SSA. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001);

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

*Keener v. Astrue*, No. 06 C 0928, 2008 WL 687132, at *1 (S.D. Ill. March 10, 2008).[2]

A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on January 27, 2009, alleging that she became disabled on August 27, 2000—later amended to December 1, 2005—because of major depression with psychosis, bipolar disorder, and an impulse disorder. (R. at 10, 45, 86, 92). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 10, 86–99). On March 1, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 10, 31–85). The ALJ also heard testimony from Randall L. Harding, a vocational expert ("VE"). (*Id.* at 10, 31–85, 117–19).

The ALJ denied Plaintiff's request for benefits on March 21, 2011. (R. at 10–20). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of December 1, 2005, through her date last insured (DLI) of December 31, 2005.[3] (*Id.* at 12). At step two, the ALJ found that Plaintiff's major depressive disorder, anxiety disorder, and bipolar disorder are severe impairments. (*Id.* at 13). At step three, the ALJ determined that through the DLI, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (*Id.*).

---

[3] The ALJ determined that Plaintiff last met the insured status requirements of the SSA on December 31, 2005. (R. at 12). Therefore, Plaintiff must establish that she was disabled between December 1 and 31, 2005, in order to qualify for benefits. *Bjornson v. Astrue*, 671 F.3d 640, 641 (7th Cir. 2012) ("only if [plaintiff] was disabled from full-time work by [her last insured] date is she eligible for benefits").

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that through the DLI, she had the RFC to

> work at a flexible pace in a low-stress job without only [*sic*] occasional decision-making required. Work is limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and few, if any workplace changes.

(R. at 14–15). At step four, the ALJ determined that through the DLI, Plaintiff was unable to perform any past relevant work. (*Id.* at 18). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including floor waxer. (*Id.* at 19–20). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 20).

The Appeals Council denied Plaintiff's request for review on June 4, 2012. (R. at 1–4). Plaintiff now seeks judicial review of the ALJ"s decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite her mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. DISCUSSION

## A. Relevant Medical Evidence Prior to Plaintiff's Date Last Insured

Plaintiff began treating with Jennifer T. Virant, M.D. in 2002. (R. at 472; *accord id.* at 40–41). On June 28, 2005, Dr. Virant diagnosed anorexia nervosa, bulimia nervosa, and depression.[5] (*Id.* at 459). She prescribed Lexapro[6] and recommended that Plaintiff see a psychiatrist as soon as possible in order to treat her symptoms. (*Id.*).

On July 26, 2005, Plaintiff returned for another consultation with Dr. Virant claiming that the Lexapro had not done much for her depression. (R. at 458). Plaintiff provided Dr. Virant with a journal that described her eating issues and recollections of a traumatic event she suffered as a child.[7] (*Id.*). In addition, Plaintiff informed Dr. Virant that she had not seen a psychologist because her husband would not give her money, and she felt embarrassed. (*Id.*). Plaintiff further stated that she had been vomiting due to her anorexia and bulimia. (*Id.*). According to Dr. Virant, Plaintiff's affect had improved. (*Id.*). She diagnosed severe post-traumatic stress

---

[5] Anorexia nervosa is a personality disorder manifested by an extreme aversion to food. *Stedman's Medical Dictionary* 82 (5th ed. 1982). Bulimia nervosa is an eating disorder characterized by binge eating and purging. <http://en.wikipedia.org/wiki/Bulimia_nervosa> Some individuals tend to alternate between anorexia and bulimia. *Id.*

[6] Lexapro (Escitalopram) is used to treat depression and generalized anxiety disorder, and is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs). <www.nlm.nih.gov/medlineplus> [hereinafter MedlinePlus]. Lexapro works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. *Id.*

[7] Plaintiff reported abuse by a family member when she was a child. (R. at 458).

disorder (PTSD), possible axis II disorder[8], anorexia, and bulimia. (*Id.*). Dr. Virant emphasized that Plaintiff needed to see a psychiatrist. (*Id.*). Dr. Virant informed Plaintiff that her problems were very complex, and she needed a great deal of psychiatric assistance to treat her conditions. (*Id.*).

Plaintiff returned for another consultation with Dr. Virant on August 8, 2005. (R. at 457). Plaintiff informed Dr. Virant that she was still vomiting occasionally and had recurring thoughts about the childhood traumatic event. (*Id.*). Dr. Virant diagnosed anorexia, bulimia, PTSD, and depression and stressed to Plaintiff the importance of seeing a psychiatrist. (*Id.*).

On October 25, 2005, Plaintiff informed Dr. Virant that she had stopped taking the Lexapro. (R. at 456). She reported mood swings, loss of appetite, sleeping all day, and lacking the desire to live. (*Id.*). On examination, Plaintiff had a blunted affect. (*Id.*). Dr. Virant diagnosed depression, possible rapid cycling,[9] and prescribed Zoloft.[10] (*Id.*). She reemphasized the importance of Plaintiff consulting with a psychiatrist. (*Id.*).

On January 6, 2011, Dr. Virant completed a Mental Capacities Assessment. (R. at 471–72). She concluded that Plaintiff is very self-destructive, has very little self-

---

[8] Axis II is for reporting personality disorders and mental retardation. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 28 (4th ed. Text Rev. 2000) (hereinafter DSM-IV).

[9] Rapid cycling is a pattern of symptoms in bipolar disorder, in which a person experiences four or more episodes of mania or depression in one year. <http://www.webmd.com/bipolar-disorder/guide/rapid-cycling-bipolar-disorder>

[10] Zoloft (Sertaline), an SSRI, is used to treat depression, obsessive-compulsive disorder, panic attacks, PTSD, and social anxiety disorder. *See* MedlinePlus.

control, and has a long history of self-mutilation. (*Id.* at 471) Dr. Virant opined that Plaintiff's ability to deal with work stresses, maintain attention to details, and demonstrate reliability are all markedly limited. (*Id.* at 471–72). She diagnosed major depressive disorder with rapid cycling bipolar features, schizoaffective disorder per treating psychiatrist, bulimia nervosa, possible PTSD due to childhood traumatic abuse, and attention deficit disorder (ADHD). (*Id.* at 472). Dr. Virant stated that her assessment would be true as of December 1, 2005. (*Id.*).

At the hearing, Plaintiff testified that in 2005, she had a hard time functioning. (R. at 49). Because of her anxiety, depression, and self-destructive behaviors, she spent most of her day in bed. (*Id.* at 49, 51). On a bad day, she believed that there were demons outside of her house. (*Id.* at 68). Two to three times a week, she would have hour-long crying spells. (*Id.*). Sometimes she had panic attacks, becoming short of breath. (*Id.*). At that time, she was diagnosed with bipolar disorder and borderline personality disorder and was seeing a therapist weekly. (*Id.* at 53). Plaintiff testified that during her manic episodes, she stopped taking her medications, thinking that she did not need them. (*Id.* at 55–60). Plaintiff stated that she has poor impulse control; even with a minimum of stress, her head will start racing and she feels the need to perform a self-destructive act to make it stop. (*Id.* at 64).

## B. Relevant Medical Evidence After Plaintiff's Date Last Insured

On March 29, 2006, Dr. Virant observed self-inflicted razor marks on Plaintiff's arm and two cigarette burns on her leg. (R. at 455). Plaintiff informed Dr. Virant that she felt "neutralized" by Zoloft and had extreme mood swings. (*Id.*). Dr. Virant

diagnosed depression and possible borderline personality disorder and decreased the Zoloft dosage. (*Id*.). Although Plaintiff stated that she was unable to find a psychiatrist or psychologist, Dr. Virant stressed the urgent importance of finding one. (*Id*.).

Subsequently, Dr. Virant saw Plaintiff on April 20, May 11, July 21, August 8, and September 7, 2006. (R. at 450–53). During these visits, Plaintiff complained of anorexia, bulimia, and self-inflicted wounds. (*Id*.). Dr. Virant diagnosed severe depression with bipolar and borderline personality disorder features, and possible borderline personality disorder. (*Id*.). Although Dr. Virant stressed that Plaintiff was not qualified to handle her profoundly complex psychological problems alone, she still refused to get other help. (*Id*. at 451). Dr. Virant increased the Zoloft dosage. (*Id*.).

On October 5, 2006, Plaintiff informed Dr. Virant that she had been attending a program in order to treat her self-mutilation. (R. at 449). Plaintiff however, had been expelled from the program because she broke her contract with the psychiatrist by self-mutilating. (*Id*.). Dr. Virant observed deep self-inflicted cuts on Plaintiff's right wrist, but Plaintiff denied suicidal ideations. (*Id*.). Plaintiff presented with blunted and inappropriate affect. (*Id*.). Dr. Virant diagnosed "profound psychiatric problems," including depression, PTSD, borderline personality, and self-mutilation, and possible personality disorder. (*Id*.).

In June 2007, Plaintiff began treating with Maleeha Ahsan, M.D., a board certified psychiatrist. (R. at 59). Plaintiff's current medications included Prozac, Ativan,

and Zyprexa.[11] (*Id.* at 309). Her prior medications included Zoloft, Wellbutrin, Seroquel, Risperdal, and Effexor.[12] (*Id.*). On June 13, 2007, Plaintiff presented with a depressed mood, flat affect, and guarded judgment and insight. (*Id.* at 310). Dr. Ahsan diagnosed major depressive disorder and impulse control disorder, and estimated Plaintiff's Global Assessment of Functioning ("GAF") at 50.[13] (*Id.*). Dr. Ahsan increased Plaintiff's Zyprexa dosage. (*Id.*).

On August 12, 2008, Plaintiff reported self-mutilating again. (R. at 313). She believed that demons were punishing her for revealing information about an assignment she received from her pastor's wife. (*Id.*). In April and May 2009, Plaintiff was administered electroconvulsive therapy. (*Id.* at 283, 320–21).

From January 1, 2008, until November 4, 2009, Plaintiff went to emergency care at least 11 times because of self-inflicted mutilations. (R. at 376–428). In addition, Plaintiff was hospitalized twice for depression and suicidal thoughts in 2008, and was further hospitalized four more times in 2009. (R. at 431–46).

---

[11] Prozac (Fluoxetine) is an SSRI and is used to treat depression, obsessive-compulsive disorder, and panic attacks. *See* MedlinePlus. Ativan (Lorazepam) is used to treat anxiety by slowing activity in the brain to allow for relaxation. *Id.* Zyprexa (Olanzapine) is an antipsychotic medication and is used to treat symptoms of schizophrenia and bipolar disorder. *Id.*

[12] Wellbutrin (Bupropion) is used to treat depression by increasing certain brain activity. *See* MedlinePlus. Seroquel (Quetiapine) and Risperdal (Risperidone) are antipsychotic medications used to treat symptoms of schizophrenia. *Id.* Effexor (Venlafaxine) is in a class of medications call selective serotonin and norepinephrine reuptake inhibitors (SNRIs) and is used to treat depression, anxiety disorders, and panic disorders. *Id.*

[13] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." DSM-IV at 32. A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

On October 1, 2009, Carrigan Manetti, Psy.D. began treating Plaintiff. (R. at 477). Over the next 15-month period, Dr. Manetti had 60 sessions with Plaintiff and subsequently provided a mental assessment on January 14, 2011. (*Id*.). In her summary, Dr. Manetti diagnosed bipolar II disorder, most recent episode depression, and chronic PTSD. (*Id*.). During the sessions with Dr. Manetti, Plaintiff was engaging and open; in addition, she complied with all counseling-based treatment recommendations. (*Id*.). Over the course of the treatment, Plaintiff demonstrated working knowledge of the coping tools that Dr. Manetti was teaching her when confronted with stressful situations. (*Id*.). However, Plaintiff was unable to effectively utilize these tools outside of counseling. (*Id*.). Dr. Manetti noted that Plaintiff's primary coping tools, such as self-isolation and self-injury, would not allow her to maintain employment. (*Id*.). In addition, due to the recurrent mood symptoms that Plaintiff suffered, she would not be able to work even on a part-time basis. (*Id*.).

Dr. Manetti opined that Plaintiff was markedly limited in her ability to deal with the public, deal with work stresses, demonstrate reliability, behave in a stable manner in stressful situations, and perform reliably in job situations requiring the use of judgment under stress. (R. at 474–75). In Dr. Manetti's assessment, Plaintiff's depressive symptoms prevent her from being able to reliably function in a job setting:

> Depressed mood, anhedonia, difficulty concentrating, and fatigue impair her ability to adhere to schedules, participate in job training, communicate well with co-workers, and function independently in stressful situations. Recurring, intrusive thoughts, and uncontrolled recalling of traumatic events have the potential to interfere with job specific tasks, as well as the ability to interact with customers and co-

workers. Suicidal ideation and self-injurious behavior experienced during severe depressive episodes require extended periods of absence from work at little or no notice. Additionally, on the job stressors have the potential to exacerbate the symptoms described above.

(*Id.* at 476). Dr. Manetti also described how Plaintiff's mental impairments impair her ability to work:

[Plaintiff's Bipolar II Disorder and PTSD] produce medically demonstrable impairments which prevent [Plaintiff] from being able to function in a work setting. Depressed mood, loss of interest in activities, psychomotor retardation, fatigue, loss of energy, feelings of worthlessness, diminished ability to think, problems concentrating, indecisiveness, and recurrent suicidal ideation are currently experienced symptoms of Bipolar II Disorder. Recurring, intrusive thoughts, uncontrolled recalling of traumatic events, and intense distress in the presence of reminders of the traumatic event are current [PTSD] symptoms. These have been demonstrated through self-report, behavioral observations, repeated engagement in unhealthy activities, inability to maintain a self-directed schedule, and multiple hospitalizations due to suicidal ideation and self-injurious behavior.

(*Id.*).

Dr. Ahsan completed a mental capacities assessment on February 23, 2011. (R. at 479–80). She opined that Plaintiff was markedly limited in her ability to relate with co-workers, deal with the public, deal with work stresses, function without supervisors, maintain attention to detail, and behave in a stable manner in stressful situations. (*Id.*). Dr. Ahsan also concluded that Plaintiff was markedly limited in her ability to understand, remember, and carry out complex job instructions; respond appropriately to usual job situations with co-workers and supervisors; and deal with changes in a routine work setting. (*Id.* at 479).

## C. ALJ Failed to Give Proper Weight to Treating Physicians' Opinions

Plaintiff's primary argument is that substantial evidence does not support the ALJ's rejection of her treating physicians' opinions. (Mot. 11–14). In her decision, the ALJ gave some weight, but not controlling weight, to Dr. Virant's opinion:

> To the extent that Dr. Virant opined that [Plaintiff] is unable to perform even simple, routine and repetitive tasks in a low-stress environment with a flexible pace with only simple decisions and few changes to the work environment, that opinion is inconsistent with the objective evidence before the date last insured. That evidence shows that [Plaintiff] was depressed with some mood swings, but was somewhat noncompliant with her medication and refused to see a specialist. In addition, Dr. Virant's opinion of [Plaintiff's] functional limits was based largely upon [Plaintiff's] subjective complaints and the doctor's sympathies for [Plaintiff]. Finally, the record indicates that Dr. Virant was an internal medicine doctor, not a psychiatrist, and her opinion of [Plaintiff's] mental functioning was outside of her specialty.

(R. at 17–18). The ALJ also rejected the opinions of Drs. Manetti and Ahsan, because Plaintiff began treating with them after the DLI. (*Id.* at 18).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded to opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a non-treating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of

treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

Dr. Virant concluded that Plaintiff is self-destructive, has little self-control, and has a long history of self-mutilation. (R. at 471). She diagnosed major depressive disorder with rapid cycling bipolar features, schizoaffective disorder per treating psychiatrist, bulimia nervosa, possible PTSD due to childhood traumatic abuse, and attention deficit disorder (ADHD). (*Id.* at 472). Dr. Virant opined that Plaintiff's ability to deal with work stresses, maintain attention to details, and demonstrate reliability are all markedly limited. (*Id.* at 471–72). She also concluded that Plaintiff's ability to obey work rules, relate with co-workers, deal with the public, use independent judgment, obey supervisors, function without supervisors, behave in a stable manner in stressful situations, and relate predictably in social situations were all moderately limited. (*Id.*). Finally, Dr. Virant opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out simple or

complex job instructions; perform reliably in job situations requiring the use of judgment under stress; and respond appropriately to usual job situations with co-workers and supervisors. (*Id.* at 471).

The ALJ discounted Dr. Virant's opinion because: (1) it was inconsistent with the evidence; (2) Plaintiff was noncompliant with her medication and refused to see a specialist; (3) it was largely based on Plaintiff's subjective complaints; and (4) the doctor is an internist, not a psychiatrist. (R. at 17–18). Under the circumstances, the ALJ's decision not to give Dr. Virant's opinion controlling weight is legally insufficient and not supported by substantial evidence.

### 1. Dr. Virant's opinion is consistent with the medical evidence.

While the ALJ contends that there were very few treatment records before Plaintiff's DLI (R. at 16), Dr. Virant had four sessions with Plaintiff—from June 2005 to October 2005—in which Plaintiff demonstrated signs of severe mental impairments. (*Id.* at 456–59). During these sessions, Plaintiff reported mood swings, anorexia, bulimia, no will to live, obsessive, ranting thoughts about food issues, and memories of childhood abuse. (*Id.*). On examination, Dr. Virant observed a blunted affect. (*Id.* at 456). She diagnosed severe PTSD, depression, anorexia, bulimia, possible personality disorder, and possible bipolar disorder, and implored her to get immediate psychiatric help for her complex psychological issues. (*Id.* at 456–59).

Moreover, Plaintiff's post-DLI treatments with Dr. Virant support her assessment. *See Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is rele-

vant to a determination of a claimant's condition during that period."); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (An ALJ must consider all of the record, "including the evidence regarding the plaintiff's condition at present."); *Newell v. Astrue*, 869 F. Supp. 2d 875, 885–86 (N.D. Ill. 2012) ("The treatment a claimant receives after his date last insured can be relevant to assessing his condition during the disability period."). Plaintiff continued treating with Dr. Virant through 2006. (R. at 448–55). During that time, Plaintiff reported extreme mood swings, self-inflicted injuries, depression, anorexia, and bulimia. (*Id.*). On October 5, 2006, Dr. Virant diagnosed "profound psychiatric problems," including depression, PTSD, borderline personality, and self-mutilation, and possible personality disorder. (*Id.* at 449).

In addition, the ALJ failed to properly consider the post-DLI medical evidence from Drs. Manetti and Ahsan, which supports Dr. Virant's opinion. Instead, the ALJ "rejected the opinions of Dr. Manetti and Dr. Ahsan, [because the] record indicates that [Plaintiff] began treatment with Dr. Ahsan in 2007 and with Dr. Manetti in 2009." (R. at 18) (citations omitted). Thus, the ALJ concluded that "these opinions are not relevant for the period at issue in this determination." (*Id.*). On the contrary, as discussed above, post-DLI medical evidence is relevant to a determination of whether Plaintiff was disabled. In 2007, Dr. Ahsan, a board certified psychiatrist, diagnosed major depressive disorder and impulse control disorder, and estimated Plaintiff's GAF at 50. (*Id.* at 310); *see Campbell*, 627 F.3d at 307 ("A GAF rating of 50 does not represent functioning within normal limits. Nor does it support a con-

clusion that Campbell was mentally capable of sustaining work."). In 2011, Dr. Ahsan opined that Plaintiff was markedly limited in her ability to relate with coworkers, deal with the public, deal with work stresses, function without supervisors, maintain attention to detail, and behave in a stable manner in stressful situations. (R. at 479–80). Dr. Ahsan also concluded that Plaintiff was markedly limited in her ability (1) to understand, remember, and carry out complex job instructions; (2) to respond appropriately to usual job situations with co-workers and supervisors; and (3) to deal with changes in a routine work setting. (*Id*. at 479).

Dr. Manetti's assessments in 2009–2011 were similar. After 60 sessions with Plaintiff, Dr. Manetti provided a mental assessment of Plaintiff on January 14, 2011. (*Id*. at 477). She diagnosed bipolar II disorder, most recent episode depression, and chronic PTSD. (*Id*.). Dr. Manetti opined that Plaintiff was markedly limited in her ability to deal with the public, deal with work stresses, demonstrate reliability, behave in a stable manner in stressful situations, and perform reliably in job situations requiring the use of judgment under stress. (R. at 474–75). In Dr. Manetti's assessment, Plaintiff's depressive symptoms and recurrent mood disorders prevent her from being able to reliably function in a job setting, even on a part-time basis. (*Id*. at 476–77). Furthermore, there is no evidence that Plaintiff's mental impairments substantially worsened during the post-DLI period, which would have rendered such evidence irrelevant. *See Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013) ("[T]here is no evidence of Pepper's eye impairments substantially worsening or altering her ability to work during the relevant claim period, which could have

altered the ALJ's [consideration of post-DLI evidence].”); *cf. Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008) (stating that certain conditions pre-dating the claimant's insured status were irrelevant when evaluating the claimant's application for benefits because the claimant “was able to engage in substantial gainful employment during and after experiencing these problems”). In sum, the ALJ improperly rejected the opinions of Drs. Manetti and Ahsan merely because they were made post-DLI. (*See* R. at 18).

### 2. *Dr. Virant observed Plaintiff's symptoms.*

Contrary to the ALJ's finding, Dr. Virant's opinions were not based *solely* on Plaintiff's subjective complaints. If a “treating physician's opinion is . . . based *solely* on the patient's subjective complaints, the ALJ may discount it.” *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added); *see also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (“[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.”). Dr. Virant's opinions were not mere recitations of Plaintiff's complaints but were also based on her objective observations. (*See, e.g.*, R. at 456 (depressed mood, blunted affect), 458 (slight improvement in affect), 455 (razor marks on arm, self-inflicted cigarette burns), 451 (30–40 cuts over right wrist), 449 (profound psychiatric problems, deep self-inflicted cut on right wrist, blunted and inappropriate affect, disoriented, seems to think that her cutting problem is funny)). Moreover, almost all diagnoses—especially mental health evaluations—require some consideration of the claimant's subjective symp-

toms, and here, Plaintiff's subjective statements were necessarily factored into Dr. Virant's analysis. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012 ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). And there is nothing in the record to suggest that Dr. Virant disbelieved Plaintiff's descriptions of her symptoms, or that Dr. Virant relied more heavily on Plaintiff's descriptions than her own clinical observations in concluding that Plaintiff was incapable of full-time work. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [Plaintiff's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *see also Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations."). Moreover, the ALJ provides no support in the record for her offhand comment that Dr. Virant's "sympathies for [Plaintiff]" affected Dr. Virant's assessment of Plaintiff's functional limitations.

### 3. The record does not support rejecting Dr. Variant's opinion because of Plaintiff's lack of compliance.

The ALJ's rejection of Dr. Virant's opinion because Plaintiff refused to see a psychiatrist was not supported by substantial evidence. (R. 18). Plaintiff stated that she did not see a psychiatrist because of embarrassment, distrust, and expense. (R.

at 458). The ALJ cannot draw a negative inference from a plaintiff's failure to seek treatment unless the ALJ has explored the plaintiff's explanations. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Here, although the ALJ drew a negative inference from Plaintiff not seeing a psychiatrist in 2005, she never questioned Plaintiff about her lack of treatment or medicine noncompliance during that period, or take into consideration that any refusal to see a psychiatrist could have been related to her mental illness. Moreover, as discussed above, once Plaintiff did seek psychiatric help, Drs. Manetti's and Ahsan's assessments of Plaintiff's mental impairments were similar to Dr. Virant's.

In addition, on remand, the Court reminds the ALJ that mental patients "are often incapable of taking their prescribed medications consistently." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011); *see Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications."). A common consequence of bipolar disorder is for the patient to take her medications during her depressive episodes but not during her manic periods. *Martinez*, 630 F.3d at 697. Moreover, "antidepressant drugs often produce serious side effects that make patients reluctant to take them." *Id.*

### 4. *The ALJ failed to articulate what weight she gave Dr. Variant's opinion.*

The ALJ did not provide the specific weight she was affording Dr. Virant's opinion. *See Campbell*, 627 F.3d at 308 ("Even if an ALJ gives good reasons for not giv-

ing controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."); *Punzio*, 630 F.3d at 710 ("And whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision."). While the ALJ can take into account that Dr. Virant was not a psychiatrist when determining the weight to give her opinion, she cannot reject Dr. Virant's opinion merely because she was an internist. (*See* R. at 18). Generally, the Commissioner gives more weight to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527.

Here, the ALJ did not explicitly address the checklist of factors as applied to the medical opinion evidence. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opin-

ion is not given controlling weight "the checklist comes into play"). And many of the factors support the conclusion that Dr. Virant's opinion should be given great weight: she is a physician who treated Plaintiff continuously for more than seven years; her findings were supported by diagnostic observations; and her findings were consistent with the medical evidence. (R. at 477–62, 459–48, 348–41).

On remand, the ALJ shall reevaluate the weight to be afforded to Dr. Virant's opinion. If the ALJ has any questions about whether to give controlling weight to Dr. Virant's opinion, she is encouraged to contact Dr. Virant, order a consultative examination, or seek the assistance of a medical expert. *See* SSR 96–5p, at *2; 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted). If the ALJ finds "good reasons" for not giving Dr. Virant's opinions controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Virant's opinion.

Finally, the ALJ erred in concluding that the state agency medical consultants' findings "support [her] determination that [Plaintiff] retained the ability to perform work-related activities on and before [the DLI]." (R. at 17). On June 8, 2009, Glenn

Pittman, M.D. reviewed the medical records and concluded that there was insufficient evidence of severe mental impairments prior to the DLI. (*Id.* at 322–34). Similarly, on August 20, 2009, R. Leon Jackson, Ph.D. came to the same conclusion. (*Id.* at 336–38). However, in making their findings, *neither Dr. Pittman nor Dr. Jackson reviewed Dr. Virant's medical records, especially those that occurred prior to the DLI.* (*See id.* at 334 (Dr. Pittman acknowledging that there were no treating source records in the medical file), 37 (Plaintiff's counsel informing ALJ at hearing that the state agency findings were made without pre-DLI evidence in the file). Thus, the findings of Drs. Pittman and Jackson are entitled to little or no weight.[14]

## D. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing

---

[14] Plaintiff also contends that the ALJ improperly rejected her credibility. (Mot. 14–15). She argues that "[t]he ALJ's primary reason for finding [her] not credible was because of the periods of time that [she] was not completely compliant with medication or the treatment suggestions from Dr. Virant." (*Id.* 14). As discussed above, the ALJ cannot reject Plaintiff's credibility merely because she was noncompliant and refused to see a psychiatrist. *See Spiva*, 628 F.3d at 351 ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications."); *Craft*, 539 F.3d at 679 (ALJ cannot draw a negative inference from a plaintiff's failure to seek treatment unless ALJ has explored the plaintiff's explanations). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. On remand, the ALJ shall consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded to Dr. Virant's opinion, as well as the opinions of Drs. Manetti and Ahsan, explicitly addressing the required checklist of factors. The ALJ shall then reevaluate Plaintiff's mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [16] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: September 30, 2013

_____
MARY M. ROWLAND
United States Magistrate Judge